No. 16-1293

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

RICHARD G. TATUM, individually and on behalf of a class
of all other persons similarly situated,

*Plaintiff-Appellant,*

v.

RJR PENSION INVESTMENT COMMITTEE;
RJR EMPLOYEE BENEFITS COMMITTEE;
R.J. REYNOLDS TOBACCO HOLDINGS, INC.; and
R.J. REYNOLDS TOBACCO COMPANY,

*Defendants-Appellees.*

_____

On appeal from the United States District Court
for the Middle District of North Carolina at Greensboro
(1:02-cv-00373-NCT-LPA)
Hon. N. Carlton Tilley, Jr.

_____

PAGE PROOF BRIEF OF APPELLANTS

_____

Jeffrey Lewis
**KELLER ROHRBACK L.L.P.**
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
(510) 463-3900

Robert M. Elliot
Helen L. Parsonage
**ELLIOT MORGAN PARSONAGE**
426 Old Salem Road
Winston-Salem, NC 27101
(336) 724-2828

Kelly M. Dermody
Daniel M. Hutchinson
**LIEFF CABRASER**
**HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000

*Counsel for Appellant*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................... 2

STATEMENT OF THE CASE ................................................................ 4

    A.    Procedural History ................................................................ 5

    B.    Statement of Relevant Facts ................................................ 7

        1.    The Nabisco Spin-Off ............................................. 7

        2.    Nabisco's Strong Fundamentals .................................. 9

        3.    The Plan Requirements ........................................... 10

        4.    The Freeze of the Nabisco Funds ............................. 12

        5.    The Forced Divestment of the Nabisco
            Funds ............................................................... 12

        6.    The Plan's Losses .................................................. 14

SUMMARY OF ARGUMENT ................................................................ 15

STANDARD OF REVIEW .................................................................... 19

ARGUMENT ...................................................................................... 20

I.    The District Court Disregarded the Mandate. ............................ 20

    A.    The District Court's Singular Focus on Risk
        Disregarded the Character and Aim of the Plan. ............... 20

        1.    A Prudent Fiduciary Would Have
            Considered Risk within the Context of a
            Diversified Portfolio. ............................................ 22

2.      A Prudent Fiduciary Would Have Relied on the Long-Term Nature of the Plan. ........................... 26

B.      The District Court Failed to Consider What a Hypothetical Prudent Fiduciary Would Have Done in the Face of Plan Language Requiring Retention of the Nabisco Funds. .......................... 28

C.      The District Court Refused to Consider Expert Testimony of Professor Lys Regarding the Prudence of the Forced Divestment. ................................... 30

D.      The District Court Failed to Consider the Timing of the Divestment Decision. ................................... 33

II.    The District Court Failed to Apply the Appropriate Legal Standard. ................................................. 36

A.      By Conflating Investment and Divestment Decisions, the District Court Failed to Evaluate What a Prudent Fiduciary Would Have Done in the "Conduct of an Enterprise of a Like Character and with Like Aims." ........................................... 37

B.      The District Court's Misapplication of ERISA Caused It to Ignore Factors Relevant to *Divestment* Decisions. ........................................... 40

1.      A Prudent Fiduciary Evaluating a Divestment Decision Would Not Have Disregarded Testimony Indicating that Nabisco's Business Remained Fundamentally Sound. ............................... 40

a.      Nabisco's Fundamentals Were Strong. ............. 40

b.      Nabisco's Long-Term Prospects Were Excellent. ........................................... 41

2.    A Prudent Fiduciary Evaluating a Divestment Decision Would Not Have Disregarded Favorable Analyst Ratings. .................. 43

3.    There Was No Compelling Reason to Divest. ............ 46

    a.    Tobacco Litigation Was Not a Compelling Reason to Divest. ............................ 47

    b.    The Decline in Nabisco Share Prices Was Not a Compelling Reason to Divest. ................................................. 54

    c.    The Risk of Holding an Unrelated Single Stock Fund Was Not a Compelling Reason to Divest. ......................... 57

III.    The District Court Misapplied the Efficient Market Hypothesis. .................................................................. 62

IV.    The Court Should Direct the District Court to Enter Judgment for Tatum and the Class On Liability. ........................ 67

V.    Tatum Respectfully Requests Reassignment on Remand. ........................................................................... 69

CONCLUSION AND RELIEF SOUGHT ............................................. 72

REQUEST FOR ORAL ARGUMENT .................................................. 74

CERTIFICATE OF COMPLIANCE ...................................................... 76

CERTIFICATE OF FILING AND SERVICE ........................................ 77

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   133 S. Ct. 1184 (2013) .................................................................. 62, 66

*Anderson v. City of Bessemer City*,
   470 U.S. 564 (1985) ............................................................................ 67

*Dea v. Wash. Suburban Sanitary Comm'n*,
   11 F. App'x 352 (4th Cir. 2001) ......................................................... 69

*DiFelice v. U.S. Airways, Inc.*,
   497 F.3d 410 (4th Cir. 2007).................................................... 21, 24, 57

*Doe v. Chao*,
   511 F.3d 461 (4th Cir. 2007).............................................................. 20

*Fifth Third Bancorp v. Dudenhoeffer*,
   134 S. Ct. 2459 (2014) .......................................................18, 33, 63, 66

*Fonner v. Fairfax Cty., Va.*,
   415 F.3d 325 (4th Cir. 2005).............................................................. 20

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009).............................................................. 31

*Humphrey v. Humphrey*,
   434 F.3d 243 (4th Cir. 2006).............................................................. 69

*In re Beck Indus., Inc.*,
   605 F.2d 624 (2d Cir.1979) ................................................................ 16

*Jiminez v. Mary Washington Coll.*,
   57 F.3d 369 (4th Cir. 1995)........................................................... 42, 53

*Milburn Colliery Co. v. Hicks,*
  138 F.3d 524 (4th Cir. 1998)................................................................ 70

*Pullman-Standard v. Swint,*
  456 U.S. 273 (1982) ............................................................................ 69

*Rinehart v. Lehman Bros. Holdings Inc.,*
  817 F.3d 56 (2d Cir. 2016) .................................................................. 66

*Rogers v. Baxter Int'l, Inc.,*
  521 F.3d 702 (7th Cir. 2008)............................................................... 27

*S. Atl. Ltd. P'ship of Tenn., LP v. Riese,*
  356 F.3d 576 (4th Cir. 2004)............................................................... 19

*Tatum v. R.J. Reynolds Tobacco Co.,*
  254 F.R.D. 59 (M.D.N.C. 2008)............................................................ 5

*Tatum v. R.J. Reynolds Tobacco Co.,*
  392 F.3d 636 (4th Cir. 2004)................................................................. 5

*Tatum v. R.J. Reynolds Tobacco Co.,*
  926 F. Supp. 2d 648 (M.D.N.C. 2013) ...................................... *passim*

*Tatum v. RJR Pension Inv. Comm.,*
  761 F.3d 346 (4th Cir. 2014),
  *cert. denied,* 135 S. Ct. 2887 (2015)........................................ *passim*

*Teamsters Joint Council No. 83 v. Centra, Inc.,*
  947 F.2d 115 (4th Cir. 1991)............................................................... 16

*United States v. Guglielmi,*
  929 F.2d 1001 (4th Cir. 1991)....................................................... 70, 71

*United States v. Wooden,*
  693 F.3d 440 (4th Cir. 2012)....................................................... 44, 61

**Statutes**

28 U.S.C. § 1291 .................................................................................. 1

28 U.S.C. § 1331 ........................................................................... 1

Employee Retirement Income Security Act of 1974,
    29 U.S.C. § 1001, *et seq.* ............................................... *passim*

ERISA § 404, 29 U.S.C. § 1104 ............................................ 4, 61

ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) ....................... *passim*

ERISA § 404(c), 29 U.S.C. § 1104(c) ................................. 24, 25

ERISA § 409(a), 29 U.S.C. § 1109(a) ........................................ 15

ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) .............................. 1

ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) .............................. 1

**Rules**

Fed. R. App. P. 4(a) ..................................................................... 1

Fed. R. App. P. 34(a) ................................................................. 72

Local Rule 34(a) ......................................................................... 72

**Regulations**

44 Fed. Reg. 37,221-37,224 (June 26, 1979) ...................... 21, 22

**Other Authorities**

Restatement (Third) of Trusts § 76 ......................................... 29

# JURISDICTIONAL STATEMENT

Plaintiff-Appellant Richard Tatum ("Tatum") filed suit pursuant to 29 U.S.C. § 1132(a)(2) to recover losses resulting from Defendants-Appellees' ("Defendants") breaches of fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. §§ 1001-1461. Accordingly, the district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. On February 18, 2016—following a bench trial, appeal, and remand for further factual determinations—the district court issued Findings of Fact and Conclusions of Law ("Memorandum Opinion" or "Op."), DE 485, and entered a final judgment in favor of Defendants that disposed of all claims and parties. DE 487. Tatum timely filed notice of appeal on March 17, 2016. DE 488. *See also* Fed. R. App. P. 4(a).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. After this Court determined that Defendant ERISA plan fiduciaries breached their fiduciary duties—to an "extent" that "appears to be unprecedented in a reported ERISA case"—by failing to prudently investigate whether, and when, to force retirement plan participants to divest their holdings of an existing plan investment option, did the district court commit reversible error by concluding that the breaching fiduciaries met their burden of proving that a hypothetical prudent fiduciary *would have made the same decision at the same time*, where the district court:

> a.  Narrowly focused on risk alone, in disregard of this Court's Mandate to evaluate (i) the plan's diversified portfolio and long-term character, (ii) "highly relevant" plan language that this Court characterized as an "extraordinary circumstance," (iii) expert testimony regarding the imprudence of the divestment decision, and (iv) the timing of the divestment decision;

b.     Misapplied the appropriate legal standard by analyzing the decision to *divest* an existing investment as if it were a decision to *add* a new investment; and

c.     Misinterpreted and misapplied the efficient market hypothesis in a manner inconsistent with Supreme Court precedent?

2. Because the record permits only one possible conclusion—defendants failed to establish that a prudent fiduciary would have made the same decision at the same time—should the Court direct the district court to enter judgment on liability in favor of Tatum and the Class?

3. On remand, should this case be reassigned to a different district court judge given that this Court will then have reversed the current trial judge three times, the trial judge disregarded this Court's Mandate following the second appeal, and the trial judge's delays have accounted for approximately seven of the more than fourteen years that this case has been pending, during which time a significant number of class members have died?

## STATEMENT OF THE CASE

Tatum is a retiree who worked for R.J. Reynolds from 1977 through 2007, during which time R.J. Reynolds merged with, and then spun off, the Nabisco food company.  On behalf of himself and a certified class of similarly situated retirement plan participants ("the Class"), Tatum alleges that Defendants breached their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, when, with little or no investigation or analysis, they forced Mr. Tatum and the Class members to sell their holdings of the plan's Nabisco corporate stock funds ("Nabisco Funds") at a time when, despite strong fundamentals and a positive outlook, Nabisco shares were trading at all-time low prices.  Tatum and the Class seek to have Defendants make their 401(k) plan whole for more than $50 million in losses attributable to the forced sale of the Nabisco Funds.

On Tatum's second successful appeal, this Court affirmed that Defendants breached their fiduciary duties and remanded for determination of causation: specifically, whether Defendants satisfied their burden of proving that a hypothetical prudent fiduciary would have made the decision to sell at the same time as defendants.

This Court also directed the district court to consider and give weight to certain facts and law in making that determination.

## A.    Procedural History

In July 2002, Defendants filed their first motion to dismiss. DE 6. Seventeen months later, the district court granted that motion, concluding that the decision to force plan participants to divest from the Nabisco Funds was not a fiduciary decision.  DE 22.  In *Tatum v. R.J. Reynolds Tobacco Co.*, 392 F.3d 636, 640 (4th Cir. 2004), this Court reversed. On remand, the district court caused additional extensive delays: it delayed ruling on a renewed motion to dismiss for two years before denying it as moot, DE 74, and delayed deciding cross-motions for summary judgment for sixteen months before denying them less than a week before trial was scheduled to commence.  DE 360. Nonetheless, the case proceeded, and the district court eventually certified a class of over 3,500 plan participants and beneficiaries who were forced to divest from the Nabisco Funds.  *Tatum v. R.J. Reynolds Tobacco Co.*, 254 F.R.D. 59 (M.D.N.C. 2008).

The parties completed a bench trial in February 2010.  Over three years later, the district court held that Defendants breached their

fiduciary duties by forcing the divestment of the Nabisco Funds without the investigation or analysis ERISA requires. *Tatum v. R.J. Reynolds Tobacco Co.* (*Tatum I*), 926 F. Supp. 2d 648, 678 (M.D.N.C. 2013). However, the district court held that Defendants did not cause Tatum's or the Class Members' losses because a hypothetical prudent fiduciary *could have* made the same decision anyway. *Id.* at 689-90.

In *Tatum v. RJR Pension Inv. Comm.* (*Tatum II*), 761 F.3d 346, 351 (4th Cir. 2014), *cert. denied,* 135 S. Ct. 2887 (2015), this Court affirmed that Defendants breached their fiduciary duties. *Id.* at 358-61. This Court also affirmed that, as breaching fiduciaries, Defendants bore the burden of proving that their imprudence did *not* cause the plan's losses. *Id.* at 363. However, the Court reversed the district court's conclusion on causation because the district court applied the wrong legal standard by evaluating whether "a hypothetical prudent fiduciary *could* have decided to eliminate the Nabisco Funds on January 31, 2000." *Id.* at 364 (emphasis in original). In determining whether a loss results from the failure to prudently investigate, the district court was required to consider whether "a hypothetical prudent fiduciary *would* have made the same decision anyway." *Id.* at 363 (citations omitted)

-6-

(emphasis in original).  Rather than merely deciding what is *possible*, this "would" standard requires proof of what is *probable*.  *Id.*  Thus, on remand, the district court's task was to consider whether Defendants had met their burden of proving that "a prudent fiduciary, more likely than not, would have divested the Nabisco Funds at the time and in the manner in which RJR did."  *Id.*  The district court was further required to remedy other errors in its analysis, including its failure to consider risk in the context of key "surrounding facts and circumstances." *Id.* at 366-68.

Defendants petitioned for a writ of certiorari, which the Supreme Court denied.

On remand, the district court concluded that Defendants did not cause the participants' losses.  Op. 64.

## B.    Statement of Relevant Facts

### 1.    The Nabisco Spin-Off

On June 15, 1999, fourteen years after the merger of Nabisco and R.J. Reynolds Tobacco into RJR Nabisco, Inc., the merged company separated its food business, Nabisco ("NA"), from its tobacco business, R.J. Reynolds Tobacco Company.  Op. 4-5.  "The impetus behind the spin-off was the negative impact of tobacco litigation on Nabisco's stock

price, a phenomenon known as the 'tobacco taint.'" *Tatum II*, 761 F.3d at 351. To accomplish the spin-off, the merged company, which was renamed R.J. Reynolds Tobacco Holdings, sold all of its NA shares to a holding company, Nabisco Group Holdings ("NGH"). Op. 4-5. All other shareholders in the old merged company, including Tatum and the Class Members, had their shares converted into one share of R.J. Reynolds Tobacco Holdings and three shares of NGH. *Id.* As part of the spin-off, R.J. Reynolds Tobacco Holdings and R.J. Reynolds Tobacco Company (collectively "RJR") agreed to indemnify the Nabisco entities for any potential tobacco liability. Op. 14.[1]

"[I]t was widely believed the shareholder value of Nabisco would be enhanced after the split because the value of Nabisco's stocks was being unnecessarily depressed by investors' fears regarding ongoing litigation against tobacco companies." *Tatum I*, 926 F. Supp. 2d at 652. Investment analysts and shareholders believed the spin-off would increase the value of the Nabisco stocks by dissipating the "tobacco

---

[1] *See also* Pl.'s Trial Exhibit ("PX")-158 / Defs.' Trial Exhibit ("DX")-13 at RJR001602, -1634.

taint."[2]  Sophisticated investors, including Carl Icahn—who "had made three previous attempts to take over Nabisco … and was well known to have an interest in the company," Op. 26—specifically supported the spin-off as a way to maximize long-term shareholder value.  *See id.*[3]

### 2.    Nabisco's Strong Fundamentals

Nabisco's fundamentals remained strong throughout 1999 and 2000.  Nabisco was the "largest manufacturer and marketer in the United States cookie and cracker industry."  PX-224 at TAT000151.  Market analysts expressed confidence in the growth of the industry.  *See, e.g.*, PX-254 at TAT000299; PX-239 at TAT000228 ("The snacking category is just exploding.").  Nabisco reported improved or better-than-

---

[2] *See* PX-220 at TAT000110 (March 1999 Merrill Lynch report stating "[t]he separation of food from tobacco reduces the concern over any tobacco implications"); PX-281 at TAT003658 ("[RJR] has been under pressure for several years from major shareholders to split the two businesses because tobacco was considered to be a drag on the stock.").

[3] *See also* PX-277 at TAT003481; PX-282 at TAT003661 ("Icahn and other backers of a breakup long argued that Wall Street failed to appreciate the value in the company's food interests because of concerns about potential legal liability for its sibling tobacco business.").

expected earnings in every quarter of 1999 (including $2.69 billion in profit in the second quarter).[4]

Accordingly, throughout 1999 and 2000, market analysts "overwhelmingly" recommended that investors "hold" or "buy" Nabisco stock, "particularly after the spin-off.'" *Tatum II,* 761 F.3d at 353 (citation omitted); *Tatum I*, 926 F. Supp. 2d at 687 n.28 ("[T]he analyst reports showed general optimism about Nabisco as a company."). Indeed, even the minority of analysts who expressed concern about the "tobacco taint" recognized that "the long term fundamentals [for Nabisco] are solid." Op. 20 (citing DX-286); *id.* at 21 (noting Nabisco's "strong fundamentals") (citing DX-276).

### 3.    The Plan Requirements

As part of the spin-off, management created separate retirement plans for Nabisco and RJR employees. The RJR employees remained in a continuation of the old merged company's plan, which was renamed

---

[4] DX-88 at RJR0018163-64 (first quarter earnings); DX-22 at RJR0018175-77 (second quarter earnings); DX-33 at RJR0018211-13 (third quarter earnings); PX-239 at TAT000228 ("in its first full quarter since it split from [RJR], posted a 37 percent rise in profits" and "better-than-expected earnings"); PX-243 at TAT000263 (NGH "reported net income for the fourth quarter compared with a net loss a year ago.").

the R.J. Reynolds Tobacco Company Capital Investment Plan (the "Plan"). Op. 8 n.2; *see also* PX-1. The purpose of the Plan was to provide long-term retirement savings for employees. *Tatum I*, 926 F. Supp. 2d at 678; *see also* PX-2 at RJR000879, -909; PX-155 at RJR000030. The Plan was an employee-directed 401(k) plan. Prior to the spin-off, it "offered its participants the option to invest their contributions in any combination of eight investment funds," including six "fully diversified funds—some containing investment contracts, fixed-income securities, and bonds; some containing a broad range of domestic or international stocks; and some containing a mix of stocks and bonds." *Tatum II*, 761 F.3d at 351. *See also* PX-2 at RJR000879, -909; PX-155 at RJR000030. The other two investment options were company stock funds: one holding NA stock and the other holding stock of the merged RJR Nabisco company. *Tatum II*, 761 F.3d at 351. After the spin-off, the RJR Nabisco fund was divided into two separate funds: one holding NGH stock and the other RJR Tobacco Holdings stock. *Id*. The NA stock fund and the NGH stock fund are referred to collectively as the "Nabisco Funds." The Plan continued to offer the six "fully diversified funds" that were offered prior to the spin-off. *Id*.

-11-

### 4. The Freeze of the Nabisco Funds

On June 14, 1999, at the time of the spin-off, RJR amended the Plan to freeze the Nabisco Funds, permitting Plan participants to retain their existing investments in the funds but prohibiting any additional investment therein. Op. 12-13 (citing PX-1 at RJR000757 § 4.03). The June amendment provided that the Nabisco Funds would remain in the Plan and "did not mention eliminating the frozen funds or limiting their duration." Op. 13 n.3.

Although a November 1999 draft amendment purported to remove the Plan language that required the retention of the Nabisco Funds as "frozen" funds, the district court found that this amendment was invalid. *Tatum I*, 926 F. Supp. 2d at 671-72 (citing DE 420). Accordingly, at the time of the divestment, "the governing Plan document required the Nabisco Funds to remain as frozen funds in the Plan." *Tatum II*, 761 F.3d at 367.

### 5. The Forced Divestment of the Nabisco Funds

Although "the vast majority of employees … retained their shares in the Nabisco Funds" following the spin-off, *Tatum II*, 761 F.3d at 353 n.3, the Nabisco Funds were eliminated from the Plan on January 31, 2000. Op. 24. Participants' shares were sold on the market at then-

prevailing, all-time low share prices.  *See id*; *see also Tatum II*, 761 F.3d at 361 n.9 ("[N]o party disputes that, on January 31, 2000, when RJR sold all of the Plan's Nabisco stock, that stock's value was at an all-time low.").

Conversely, all contemporaneous evidence showed that similarly situated fiduciaries and investors held their Nabisco shares.  First, numerous RJR officers, including Chairman and CEO Andrew Schindler, Executive VP and CFO Ken Lapiejko, and Executive VP Robert Gordon, held their Nabisco stock and/or options until December 11, 2000, and benefitted personally from the rise in Nabisco share prices that occurred beginning in March of 2000.[5]  *See* Op. 24-25. Second, investor Carl Icahn "continued to hold a significant number of shares through at least June 1999" and purchased six million more shares of NGH stock in November 1999.  Op. 26.  Third, employees of two former subsidiaries (Winston-Salem Health Care and Winston-Salem Dental Care) still held frozen Nabisco stocks in their 401(k) plan. *Tatum I*, 926 F. Supp. 2d at 667 & n.15.

---

[5] Gordon played a key role in deciding to eliminate the Plan's Nabisco Funds.  *E.g.*, Op. 11, 18, 20.

### 6.    The Plan's Losses

On January 31, 2000—when participants were forced to divest—
NGH stock was priced at $8.62 per share, and NA stock was priced at
$30.18 per share.  Op. 24.  Beginning in spring 2000, as had been
anticipated by corporate officers and others, Nabisco stock prices rose.
Op. 25.[6]  On December 11, 2000, R.J. Reynolds Tobacco Company
reacquired NGH for approximately $30 a share and Philip Morris
purchased NA for approximately $55 a share.  Op. 26.  These prices
represented an increase of 247% for NGH and 82% for NA over the
prices at which the Plan sold the Nabisco Funds in January 2000.  *Id.*

---

[6] The share price began to climb when Icahn initiated his fourth
attempt to take over Nabisco.  Op. 25-26.  Icahn's proxy fights to take
over the company were such a regular occurrence that an RJR Nabisco
executive described them publicly as a "rite of spring."  PX-304 at 4.
Icahn's 2000 bid provoked competing offers, and a series of corporate
transactions ensued.  Op. 25-26.

## SUMMARY OF ARGUMENT

ERISA's fiduciary duties, including the duty of prudence, are "the highest known to the law.'" *Tatum II*, 761 F.3d at 356-57 (citation omitted). Here, defendants not only breached their duties, but as this Court recognized, the "extent" of their imprudence "appears to be unprecedented in a reported ERISA case." *Id.* at 369.

A fiduciary "'shall be personally liable' for 'any losses to the plan *resulting from each such breach.*'" *Id.* at 361 (quoting 29 U.S.C. § 1109(a) (emphasis in original). Consistent with principles of trust law and ERISA's purpose of protecting plan participants, "a plaintiff who has proved the defendant-fiduciary's procedural imprudence and a prima facie loss prevails *unless* the defendant-fiduciary can show, by a preponderance of the evidence, that a prudent fiduciary *would have* made the same decision." *Id.* at 364 (emphasis in original). Accordingly, Defendants are liable for the Plan's losses unless they can prove that a hypothetical prudent fiduciary "*more likely than not*" would have forced Plan participants to divest from the Nabisco Funds "*at the time and in the manner in* which RJR did." *Id.* at 364 (emphases added).

-15-

Although the district court's opinion on remand purports to address what was probable, *see* Op. 58 ("it is more likely true than not"), and uses the words "would have" instead of "could have," *id.*, its factual findings and conclusions demonstrate, at most, remote possibility. Indeed, the district court's conclusion—that a prudent fiduciary would have made the *same decision* as that reached by defendants through their failure to exercise prudence, and would have done so *at the same time* as that "chosen arbitrarily and with no research," *Tatum I*, 926 F.Supp.2d at 689 (emphasis added)—makes a mockery of this Court's admonition that although "such 'blind luck' is possible, it is rare." *Tatum II*, 761 F.3d at 366 (stating that the fact that "courts tend to conclude that the breaching fiduciary was liable … is precisely the result anticipated by ERISA's statutory scheme"); *see also id.* (citing *In re Beck Indus., Inc.*, 605 F.2d 624, 636 (2d Cir.1979) ("Courts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same.")).[7]

---

[7] ERISA "should be liberally construed in favor of protecting the participants in employee benefits plans." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 123 (4th Cir. 1991).

The district court ignored evidence and context that this Court specifically determined to be relevant, including the Plan's diversified portfolio, the long-term character of the Plan, Plan language compelling the retention of the Nabisco Funds, and expert testimony explaining that a prudent investor would not have divested under the circumstances. Consequently, the district court's opinion directly contravenes the Mandate and cannot support a conclusion that a prudent fiduciary, more likely than not, would have forced the divestment of the Nabisco Funds.[8] Because the district court further defied the Mandate by failing to evaluate whether a prudent fiduciary would have deferred the divestment or followed an alternative timeline, its opinion also provides no basis to conclude that a prudent fiduciary, more likely than not, would have forced the divestment according to Defendants' arbitrary timeline, particularly when the Nabisco shares were trading at all-time low prices.

The district court's failure to demonstrate what was probable is underscored by other legal and factual errors. First, by considering

---

[8] As explained below, the district court also ignored its own factual findings.

-17-

factors relevant to *investment* decisions rather than *divestment*

decisions, the district court failed to consider what a prudent fiduciary

would have done "in the conduct of an enterprise of a like character and

with like aims." 29 U.S.C. § 1104(a)(1)(B). Had the district court

evaluated factors relevant to divestment decisions, it could not properly

have weighed risk against the foreseeability of "extraordinary returns"

nor ignored evidence supporting the retention of the Nabisco Funds,

including that other fiduciaries and investors retained Nabisco stocks.

Second, the district court's conclusion that risk outweighed the

foreseeability of returns was based on a clearly erroneous application of

the efficient market hypothesis. The district court relied heavily on the

fact that, pursuant to that hypothesis, all positive public information

about Nabisco's prospects was reflected in the share price. But it

ignored the corollary that all *negative information, including risk,* was

also incorporated into the price. This internally inconsistent

application of the hypothesis not only constitutes clear error, but flies in

the face of a recent Supreme Court decision explaining that, in light of

the hypothesis, a prudent fiduciary is not required to remove an

investment option based on publicly disclosed risk. *Fifth Third Bancorp*

*v. Dudenhoeffer*, 134 S. Ct. 2459, 2472 (2014).  Because the market price already reflected publicly disclosed risk—and because there was no evidence regarding non-publicly disclosed risk—there was *no* reason for the district court to conclude that risk outweighed the possibility of returns or otherwise justified the forced divestment of the Nabisco Funds.

Although each of these errors is a sufficient ground to reverse, the sum of these errors precludes a determination that a hypothetical prudent fiduciary, more likely than not, would have reached the same decision at the same time as Defendants.

## <u>STANDARD OF REVIEW</u>

The Court "review[s] de novo … whether a post-mandate judgment of a district court contravenes the mandate rule, or whether the mandate has been 'scrupulously and fully carried out.'"  *S. Atl. Ltd. P'ship of Tenn., LP v. Riese*, 356 F.3d 576, 583 (4th Cir. 2004) (citations omitted).  It reviews "a judgment resulting from a bench trial under a mixed standard of review—factual findings may be reversed only if clearly erroneous, while conclusions of law are examined de novo." *Tatum II*, 761 F.3d at 357 (citation omitted).  The application of law to

facts is reviewed de novo. *See, e.g., Fonner v. Fairfax Cty., Va.*, 415 F.3d 325, 330 (4th Cir. 2005).

## ARGUMENT

## I. The District Court Disregarded the Mandate.

"[A] district court may not violate the mandate of a circuit court of appeals …." *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007) (citation omitted). Notwithstanding this "firmly established" precept, *id.*, in concluding that a hypothetical prudent fiduciary would have made the same decision as Defendants, the district court disregarded numerous aspects of this Court's *Tatum II* opinion. Specifically, the district court failed to follow this Court's directions to consider: (i) the character and aims of the Plan; (ii) the "extraordinary circumstance" of the Plan's language requiring the retention of the Nabisco Funds; (iii) testimony from Professor Lys regarding the prudence of divesting from investments generally, and from the Nabisco Funds in particular; and (iv) the timing of the divestment decision.

## A. The District Court's Singular Focus on Risk Disregarded the Character and Aim of the Plan.

The district court's prior opinion—that a prudent fiduciary *could* have forced the divestment of the Nabisco Funds—was based largely on

-20-

the risk of holding a non-employer single stock and risk associated with tobacco litigation. *Tatum I*, 926 F. Supp. 2d at 684-86, 690. On appeal, this Court rejected the contention that "the high-risk nature of the Nabisco Funds" meant that "a prudent fiduciary *would* have eliminated them from the Plan." *Tatum II*, 761 F.3d at 366 (emphasis added). "Although risk is a relevant consideration in evaluating a divestment decision, risk cannot in and of itself establish that a fiduciary's decision was objectively prudent." *Id.* Instead, as the Department of Labor has instructed, the prudence of conduct depends on context, and even a high-risk investment is permissible if it is prudent in light of the "surrounding facts and circumstances." *Id.* at 367 (quoting 44 Fed. Reg. 37,221, 37,224 (June 26, 1979)).

These "surrounding facts and circumstances" include "the character and aim of the particular plan." *Tatum II*, 761 F.3d at 358 (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007)). Unfortunately, on remand, the district court again one-sidedly emphasized risk, and refused to consider the character and aims of the Plan, including: (i) the Plan's diversified portfolio of investment options;

and (ii) the fact that the Plan was designed for long-term retirement investing.

### 1. A Prudent Fiduciary Would Have Considered Risk within the Context of a Diversified Portfolio.

In *Tatum II*, this Court required the district court to consider what a prudent fiduciary would have done in the context of the Plan's specific portfolio. In determining "the prudence of an investment decision," the district court was required to examine "the role that the proposed investment or investment course of action plays within the overall plan portfolio." *Tatum II*, 761 F.3d at 370 (citing 44 Fed. Reg. 37,221, 37,222). This Court also held that fiduciaries may retain a comparatively risky options, even "single-stock investments," within "a portfolio of diversified funds." *Tatum II*, 761 F.3d at 356.

The district court ignored these instructions at best, and defied them at worst. It did not address the diverse array of other investment options offered to Plan participants, including an interest income fund, index funds designed to parallel stock market returns, and conservative, moderate, and aggressive balanced funds. PX-1 at RJR000757-60. It relied almost exclusively on risk without *any* consideration of how a prudent fiduciary would have assessed the risk

-22-

of the Nabisco Funds within the context of the Plan's diversified portfolio. *See, e.g.*, Op. 31-38, 56-57, 61-63. It insisted that a prudent fiduciary would not have tolerated the risk of a non-employer single-stock fund, *see* Op. 31-32, 36-38, 61-62, 64, without addressing this Court's instruction that "the diversification and prudence duties do not prohibit a plan trustee from holding single-stock investments as an option in a plan that includes a portfolio of diversified funds." *Tatum II*, 761 F.3d at 356.

The district court also ignored expert testimony regarding risk within a diversified portfolio. It previously recognized that one of Tatum's fiduciary experts, Dr. Alan Biller, gave "persuasive" testimony as to prudent decision-making. 926 F. Supp. 2d at 678. However, on remand, the district court ignored Dr. Biller's explanation that it may be "perfectly sensible" to include "high risk" investment options in 401(k) plans because "[n]ormally in a 401(K) plan, there are investment options which have different risks and different degrees of risks, some higher than others." Trial Transcript Volume ("Vol.") V 141:8-12. It even ignored the concession of *Defendants' expert*, Howard Crane, that

"in a defined contribution plan, such as a 401(k), there is no per se problem with a broad range of risks." Vol. XIV 5:2-3.

The district court provided no justification for its refusal to follow the Mandate. Its reliance on the "disposition effect"—"according to which 'investors are irrationally reluctant to sell investments that have fallen in price,'" Op. 61-62 (quoting Vol. V 145:21-146:6); *see also* Op. 35—is a red herring. The Plan was a participant-directed 401(k) plan, meaning that participants got to decide how to invest their retirement savings among the Plan's menu of investment options. *See, e.g.*, *Tatum II*, 761 F.3d at 351. Fiduciaries of such a plan are obligated to ensure that all available options are prudent, but they are not required to prevent participants from acting irrationally in allocating their retirement money to, or removing it from, any particular option. *See, e.g.*, *DiFelice*, 497 F.3d at 418 n.3 (ERISA "section 404(c) does limit a fiduciary's liability for losses that occur when participants make poor choices from a satisfactory menu of options").[9] Thus, whether or not

---

[9] Relatedly, the general effectiveness of attempts to "educate[] participants about the plan, the financial market, and basic investment principles," Op. 35, is beside the point, since Congress chose to allow retirement plan sponsors to adopt plans that provide participants with the choice of investing in or divesting from various

-24-

investors tend to react rationally to short-term price declines is irrelevant so long as each investment option—including any that has dropped in price—remains prudent within the diversified portfolio.[10]

Moreover, the district court never considered another matter that this Court deemed crucial—namely, whether "freezing the Funds had already mitigated the risk." *Tatum II*, 761 F.3d at 368. In other words, there was no risk that participants would invest any *additional* money in the Nabisco Funds. The district court never addressed the fact that, because of the freeze, the divestment affected only those participants who *chose to retain their investments in the Nabisco Funds*—

---

plan investment options, ERISA 404(c), 29 U.S.C. 1104(c), and did not forbid plans from offering single-stock funds or risky investments among such options, as this Court recognized in *Tatum II*.

[10] Indeed, relying on the "disposition effect" in the absence of a compelling reason to divest would have deprived Plan participants of the right to decide for themselves whether to retain their holdings in the Nabisco Funds until the share prices recovered. *See generally* Vol. V 41:13-24 (Biller) (explaining that a fiduciary of a participant-directed 401(k) plan offering a diversified portfolio of investment options must consider the "impact on participants" of "narrowing their range of choice."). Defendants were aware that Plan participants, including Tatum, opposed the elimination of the Nabisco Funds, *Tatum II*, 761 F.3d at 354, 359, and it is unclear how many additional participants would have objected if not for Defendants' repeated communications to participants stating, erroneously, that regulations did not permit the retention of the Nabisco Funds. *Id.* at 353-54.

participants who had already suffered losses as a result of the drop in share prices.

Because the district court never considered whether the riskiness of the Nabisco Funds was reasonable in light of the Plan's diversified portfolio, its opinion cannot support a conclusion that a hypothetical prudent fiduciary, more likely than not, would have eliminated the Nabisco Funds as investment options.

## 2. A Prudent Fiduciary Would Have Relied on the Long-Term Nature of the Plan.

The district court recognized in its prior decision—and this Court agreed—that Defendants' decision to eliminate the Nabisco stock was imprudent, in part, because "there was no consideration of 'the purpose of the Plan, which was for long term retirement savings.'" *Tatum II*, 761 F.3d at 359 (citation omitted). However, the district court paradoxically ignored this "long term" purpose in considering what a hypothetical prudent fiduciary *actually would have done*.

The district court noted "the Plan's purpose to help participants meet long-term savings goals," Op. 61, but made no attempt to consider what a hypothetical prudent fiduciary would have done in light of that long-term purpose, or in light of the long-term nature of the Nabisco

Funds.[11]  It failed to recognize that, absent a compelling reason to divest, it can remain prudent to hold long-term investments that experience significant losses.  *See, e.g.*, *Rogers v. Baxter Int'l, Inc.*, 521 F.3d 702, 705 (7th Cir. 2008) ("People who pursue a buy-and-hold strategy, one particularly appropriate for pension investments, are unaffected by the volatility in market prices that accompanies the announcement of particular pieces of good and bad news.").[12]

\*    \*    \*

By failing to evaluate risk within the context of the Plan's diversified portfolio and its design for long-term retirement savings, the district court failed to demonstrate what a prudent fiduciary "would have done" in light of the "character and aims" of the Plan.

---

[11] *See, e.g.*, PX-2 (1998 Summary Plan Description) at RJR000909 ("The Nabisco Common Stock Fund seeks to maximize long-term total return through capital appreciation and dividend income.").

[12] It also ignored its own finding that even the minority of analysts who were concerned about tobacco litigation recognized that "the long term fundamentals [for Nabisco] are solid."  Op. 20-21 (quoting DX-286).

**B.    The District Court Failed to Consider What a Hypothetical Prudent Fiduciary Would Have Done in the Face of Plan Language Requiring Retention of the Nabisco Funds.**

ERISA requires fiduciaries to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]."  29 U.S.C. § 1104(a)(1)(D). To this end, "courts have found a breaching fiduciary's failure to follow plan documents to be highly relevant in assessing loss causation." *Tatum II*, 761 F.3d at 367.  This Court previously held that "the district court erred by failing to factor into its causation analysis RJR's lack of compliance with the governing Plan document," *id.* at 368, specifically, Plan language requiring "the Nabisco Funds to remain as frozen funds in the Plan." *Id.* at 367.

On remand, the district court again refused to give any weight to the Plan language. Op. 61.  Even though this Plan language constituted an "*extraordinary circumstance*[ ] surrounding RJR's decision to divest," *Tatum II*, 761 F.3d at 368 (emphasis added), the district court concluded that *a hypothetical prudent fiduciary* would have ignored it because the *fiduciaries of this Plan* (i) did not "intentionally" disregard the documents, (ii) thought that a draft plan amendment—which would

-28-

have eliminated the mandate to retain the Nabisco Funds—was

operative, and (iii) would have taken the necessary steps to adopt the

amendment had they known it was inoperative.  Op. 59-61.[13]  But

neither the subjective beliefs of these *imprudent* fiduciaries, nor

speculation as to their possible actions, is relevant here, since it has

already been adjudged that Defendants breached their fiduciary duties.

The subsequent causation analysis requires inquiry into what a

*hypothetical prudent fiduciary* would have done.

A prudent fiduciary, who has a duty to act "in accordance with the

documents and instruments governing the plan," 29 U.S.C.

§ 1104(a)(1)(D), would know what the Plan did and did not require.  *See*

*also* Restatement (Third) of Trusts §  76 & cmt. c (providing that the

trustee should familiarize itself with the terms of the trust).

Accordingly, in recognition of the invalidity of the draft amendment, *see*

*supra* note 15, this Court concluded that the district court should

---

[13] The district court found that this amendment was invalid, and no
party challenged that ruling on appeal.  *Tatum II*, 761 F.3d at 353 n.2.
Tatum stipulated that he would not assert that Defendants were liable
for violating 29 U.S.C. § 1104(a)(1)(D), but preserved the argument
that the Plan language requiring the retention of the Nabisco Funds
was "highly relevant" to what a prudent fiduciary would have done.
*Id.* at 367-68.

consider what a hypothetical prudent fiduciary would have done in the face of the *unaltered* Plan language that "required the Nabisco Funds to remain as frozen funds in the Plan." *Tatum II*, 761 F.3d at 367. The district court utterly failed to address this question.

Finally, the district court's other attempt to avoid this Court's direction is similarly meritless. "ERISA mandates that fiduciaries act 'in accordance with' plan documents, *Tatum II*, 761 F.3d at 367 (quoting 29 U.S.C. § 1104(a)(1)(D)), regardless of whether plan participants have advance knowledge of the fiduciaries' intent to contradict those documents. Op. 59.

## C.    The District Court Refused to Consider Expert Testimony of Professor Lys Regarding the Prudence of the Forced Divestment.

In *Tatum II*, this Court held that "the district court abused its discretion to the extent it refused to consider the testimony of one of Tatum's experts, Professor Lys, regarding what a prudent investor would have done under the circumstances." 761 F.3d at 368 n.17. This Court explained that "[e]ven though Professor Lys lacked expertise as to

the specific requirements of ERISA, his testimony was relevant as to what constituted a prudent investment decision." *Id.*[14]

Notwithstanding this clear mandate, on remand the district court again disregarded most of Professor Lys's testimony, arguing that Lys was an expert "from the perspective of an investor, not a fiduciary." Op. 29. It claimed that a prudent investor acts "to further his own economic interest" whereas a prudent fiduciary "must make decisions in the interests of beneficiaries." *Id.* at 29 n.12. *This is the same rationale on which the court based its earlier, erroneous exclusion of Professor Lys's testimony*, *see Tatum I,* 926 F. Supp. 2d at 678 n.23, and the district court's distinction between an investor and a fiduciary directly contradicts this Court's Mandate. In *Tatum II*, the Court explained that Professor Lys's testimony "was relevant as to what constituted a prudent investment decision," 761 F.3d at 368 n.17, and recognized that "[a] fiduciary must behave *like a prudent investor* under similar circumstances." *Id.* (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009)) (emphasis added).

---

[14] Professor Lys was the Eric L. Kohler Chair in Accounting of the Kellogg School of Management at Northwestern University. *Cf.* Op. 28 n.11.

-31-

Although the district court cited Lys's testimony regarding the
prudent *process* that an investor would conduct, Op. 28-29, it ignored
Lys's conclusion that the decision to divest was *objectively* imprudent.
*See*, *e.g.*, Vol. VIII 39:20-25, 46:14-47:1, 169:15-23 (reading from PX-299
at ¶ 72). It ignored Professor Lys's testimony that, based on a thorough
review of analyst reports, other materials in the case, and his
knowledge of prudent investing, "there [was not] a compelling reason in
the spring of 1999, to decide to sell the Nabisco Stocks," and that "the
reason to sell was weaker in the fall and end of the year 1999, than it
was earlier in 1999." *Id.* at 87:6-19; *see also id.* 87:20-21 ("[T]here was
even less reason[ ] to sell" by fall 1999).

The closest the district court came to addressing this testimony on
the prudence of selling the stock was in briefly noting one piece of
Professor Lys's testimony: that "the reason to sell the Nabisco stocks
became less and less and less" over time. Op. 57 (quoting Vol VIII
49:21-22). But the court promptly rejected this as less "persuasive"
than other testimony regarding "risk and value." *Id.* Even this
assertion—based on only a snippet of Professor Lys's testimony—is of

-32-

questionable merit.[15]  However, even if it were true, the district court

nonetheless defied the Mandate by ignoring the rest of Professor Lys's

testimony as to the prudence of selling the stock.

## D.  The District Court Failed to Consider the Timing of the Divestment Decision.

"[T]he content of the duty of prudence turns on 'the

circumstances … prevailing' *at the time* the fiduciary acts …."

*Dudenhoeffer*, 134 S. Ct. at 2471 (emphasis added) (citing 29 U.S.C.

§ 1104(a)(1)(B)).  Hence, even if it were probable that a prudent

fiduciary would have forced the divestment of the Nabisco Funds at

*some* time, Defendants still would be liable for the Plan's losses unless a

prudent fiduciary, more likely than not, would have effectuated that

decision *on January 31, 2000*, when the Nabisco stocks were trading at

all-time low prices.  The district court's prior opinion failed to determine

whether "a prudent fiduciary, more likely than not, would have divested

---

[15] The district court's decision to more heavily weigh other testimony was based on its one-sided focus on risk, in contravention of this Court's Mandate, *see supra* at 20-22; its disregard for all other evidence supporting a decision to hold the stock as a frozen fund, *see infra* at 40-61; its failure to apply the proper legal standard by incorrectly analyzing value in terms of "extraordinary returns," *see infra* at 36-39; and its misapplication of the efficient market hypothesis.  *See infra* at 62-67.

-33-

the Nabisco Funds *at the time and in the manner in* which RJR did."
*Id.* at 364 (emphasis added).  Accordingly, the Mandate required that
the district court consider "the timing of the divestment, as part of a
totality-of-the-circumstances inquiry." *Id.* at 368.

The district court's brief discussion of "timing," Op. 56-57, 64,
focused primarily on the inapposite question of whether there was
enough time *between Defendants' initial decision and the divestment
date* to provide notice to participants and to facilitate certain logistical
tasks.  However, whether a prudent fiduciary would have provided six
months' notice of the divestment date does not answer whether a
prudent fiduciary would have chosen to divest on a particular date:
January 31, 2000.

To the limited extent the district court considered the timing of
the divestment (in barely a page), it failed to address the totality of the
circumstances then prevailing and instead relied on increased risk due
to tobacco litigation.  *See id.*  Yet, even if a hypothetical prudent
fiduciary would have taken into consideration that perceived risk, the
district court provided no explanation as to whether—or why—such risk
would justify forcing the divestment of Nabisco stock *at a time when*,

-34-

"despite … strong fundamentals and a positive market outlook," it was performing at an all-time low. *Tatum II*, 761 F.3d at 368. Indeed, as this Court previously explained:

> RJR blinks at reality in maintaining that its actions served to "protect[ ] participants" or to "minimize the risk of large losses." To the contrary, RJR's decision to force the sale of its employees' shares of Nabisco stock, within an arbitrary timeframe and irrespective of the prevailing circumstances, ensured immediate and permanent losses to the Plan and its beneficiaries.

*Id.* at 361 (alteration in original).

The district court's cursory discussion of timing also noted that Nabisco stock prices had fallen. Op. 64. However, to the extent the district court believed a price decline was relevant to the timing of the divestment, that conclusion was incorrect and contradicted by *all* parties' experts. *See infra* at 54-57.

Other than noting falling stock prices, the district court scarcely discussed the fact that the forced divestment occurred while shares were trading at an all-time low. It failed to consider that by forcing the divestment at such a time, Defendants locked in participants' losses. It "failed to consider '[t]he idea that, perhaps, it would take a while for the tobacco taint to dissipate.'" *Tatum II*, 761 F.3d at 359 (alteration in

original) (quoting *Tatum I*, 926 F. Supp. 2d at 679). It did not evaluate whether a prudent fiduciary would have eliminated the Nabisco Funds—long-term retirement investments with good fundamentals—within a mere six months of the spin-off, a major corporate transaction designed to "enhance shareholder value." Op. 13-14.

*    *    *

In short, rather than follow this Court's Mandate, the district court stubbornly ignored it. As demonstrated above, in some instances, this legal error reflected a patent refusal to consider issues. But in no instance was it justified by factual findings, as the district court's disregard of the Mandate was rooted in its disregard of its own prior factual findings, uncontested Plan documents, expert testimony from Dr. Biller that it previously found "persuasive," and expert testimony from Professor Lys that this Court directed the district court to consider. For these reasons alone, the district court's conclusion regarding causation must be reversed.

## II.    The District Court Failed to Apply the Appropriate Legal Standard.

The district court's holding was based on its conclusion that "holding [the Nabisco] funds was not worth the risk because there was

no reason in 1999 and 2000 to expect *extraordinary returns*" from the

Nabisco Funds.  Op. 38 (emphasis added); *accord* Op. 61-63; Op. 53

("[T]he appreciation of the stock prices of NGH and NA after March

2000 was not foreseeable.").  Not only did the district court rely on

perceived "risk" without considering the character and aims of the Plan,

in contravention of the Mandate, but its decision to weigh that risk

against the foreseeability of "extraordinary returns" is based on a

failure to apply the appropriate legal standard.  *See Tatum II*, 761 F.3d

at 368 ("Reversal is required when a district court has applied an

'incorrect [legal] standard [ ]' that 'may … have influenced its ultimate

conclusion.'"  (citation omitted)).

**A.    By Conflating Investment and Divestment Decisions, the
District Court Failed to Evaluate What a Prudent
Fiduciary Would Have Done in the "Conduct of an
Enterprise of a Like Character and with Like Aims."**

To determine what a hypothetical prudent fiduciary "would have"

done, ERISA requires a court to determine what outcome would have

resulted from exercising:

> the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in
> a like capacity and familiar with such matters would use *in
> the conduct of an enterprise of a like character and with like
> aims*.

29 U.S.C. § 1104(a)(1)(B) (emphasis added). In this case, "an enterprise of a like character and with like aims" was the decision whether to "*divest*[] the Nabisco Funds at the time and in the manner in which RJR did." *Tatum II*, 761 F.3d at 364 (emphasis added).

A decision to *divest* an existing investment option is distinct from a decision to *select* a new investment option. *See, e.g.*, Vol. VIII 71:10-18 (Lys) (explaining that he was not "asked to analyze" whether investors should have bought the Nabisco stocks; he "was asked as to whether they should sell"). As Tatum's expert Dr. Biller explained, the "particulars" of a prudent course of conduct "depend on the decision in question," and in this case, the relevant decision was whether to "eliminate an investment option from a plan." Vol. V 38:16-20.

The district court previously recognized this distinction in concluding that Defendants breached their fiduciary duties. Specifically, it relied on Dr. Biller's "persuasive" testimony that "focused more on the risk of divesting a fund already in the Plan" and explained that a decision to divest an existing option required "*more* significant investigation" because of the "potential immediate losses to participants that would come from forcing a sale within an arbitrary time frame."

-38-

*See Tatum I*, 926 F. Supp. 2d at 677 (emphasis added). *See also id.* at 678 (explaining that Defendants acted imprudently by *inter alia* failing to consider "the impact on participants of removing a fund already in the Plan."). As Dr. Biller explained, "[i]f an option is already in the plan, one needs some definite reason to remove it from the plan. Other things equal, the options should stay." Vol. V 41:2-7; *see also id.* at 38:16-41:1, 41:13-24, 64:18-65:5. "[T]he question really is whether the investment and ultimately the underlying company is sufficiently sound to remain as an option in the plan." *Id.* at 39:3-7.

Unfortunately, the district court's decision on remand—including its emphasis on the foreseeability of "extraordinary returns"—entirely disregarded the distinction between *investment* decisions and *divestment* decisions, which the court recognized in its previous decision. The district court failed to realize that the foreseeability of "extraordinary returns"—as opposed to mere *ordinary* returns—does not indicate, one way or another, whether there was a compelling reason to force the sale of the Nabisco Funds, particularly on an arbitrary timeline and while they were trading at all-time low prices.

**B.    The District Court's Misapplication of ERISA Caused It to Ignore Factors Relevant to *Divestment* Decisions.**

The district court's conflation of *investment* and *divestment* decisions—including its insistence on weighing risk against the foreseeability of "extraordinary returns"—caused it to ignore factors relevant to a divestment decision, including: (i) Nabisco's strong business fundamentals; (ii) overwhelmingly favorable analyst recommendations; and (iii) the absence of any compelling reason to force the divestment of the Nabisco Funds.

**1.    A Prudent Fiduciary Evaluating a Divestment Decision Would Not Have Disregarded Testimony Indicating that Nabisco's Business Remained Fundamentally Sound.**

**a.    Nabisco's Fundamentals Were Strong.**

Nabisco's business remained strong throughout 1999 and 2000. *See supra* at 9-10.  *See also* PX-170 at TAT000001 (Nabisco's "strengthened business fundamentals will drive the future performance of both our NGH and NA shares.").  Nabisco remained the largest manufacturer and marketer in the U.S. cookie and cracker industry and analysts remained confident in the growth of the industry.  *See supra* at 9-10. Analysts expressed "growing confidence" in Nabisco following the spin-off, PX-254 at TAT000299, and Nabisco reported improved or

better-than-expected earnings in every quarter of 1999. *See supra* at 9-10, n.10.

The district court entirely ignored Nabisco's strong fundamentals and positive business outlook. It failed to consider whether a prudent fiduciary would have concluded that forcing the sale of the Nabisco Funds in January 2000, in the words of this Court, "amount[ed] to 'selling low' despite Nabisco's strong fundamentals and positive market outlook." *See Tatum II*, 761 F.3d at 368. As Dr. Biller explained, a prudent fiduciary evaluating a divestment decision would not have "ignor[ed] the information that was available, that Nabisco's Company, and therefore Nabisco Stock, remained perfectly prudent as investments." Vol. V at 48:13-49:1. Because "the company was sound, in a strong position" and the "industry was sound," "the evidence basically … produced no reason to remove the option." *Id.* at 64:10-65:2.

### b. Nabisco's Long-Term Prospects Were Excellent.

Experts tracking Nabisco generally agreed "that the company was strong, that it had a strong market position, that it was well-managed, [and] that its long term business prospects were good." Vol. V 47:13-23 (Biller). Consistent with this positive long-term outlook, RJR officers

and executives—including the CEO, CFO, and an Executive VP who was a key decision-maker regarding the Nabisco Funds—held their personal shares of Nabisco stock and/or options throughout 1999 and 2000, choosing to sell only *after* the stocks had more than recovered their losses, on December 11, 2000. *See supra* at 13.

Although the district court noted that these executives retained their personal holdings of Nabisco stock, *id.*, its causation analysis did not address this fact. Moreover, the district court failed to consider entirely whether, notwithstanding any short-term volatility triggered by tobacco litigation, a hypothetical prudent fiduciary would have realized that Nabisco Funds remained prudent as long-term investments because Nabisco's "long term business prospects were good." Vol. V 47:18-20 (Biller).[16]

---

[16] The failure to consider Nabisco's strong fundamentals and long-term prospects not only reflects the district court's *legal* error—in failing to consider what a prudent fiduciary would have done in the "conduct of an enterprise of a like character"—but also constitutes clear factual error. *See, e.g.*, *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 384 (4th Cir. 1995) ("The district court's conclusion is erroneous because it failed to consider other substantial, contrary evidence.").

## 2. A Prudent Fiduciary Evaluating a Divestment Decision Would Not Have Disregarded Favorable Analyst Ratings.

"[A]nalyst reports throughout 1999 and 2000 rated Nabisco stock positively, 'overwhelmingly recommending [to] "hold" or "buy," particularly after the spin-off.'" *Tatum II,* 761 F.3d at 353 (citation omitted); *see also supra* at 10. Based on this "consensus" analyst view, both Dr. Biller and Professor Lys testified that it would have been prudent to *hold*, not sell, the Nabisco Funds. Vol. V. 71:22-72:1, 195:15-18 (Biller) ("consensus of analyst ratings … was positive"); Vol. VIII 170:1-17 (Lys) (reading from PX299 at 19-20). However, despite this Court's recognition that relying on outside financial expertise is part of a prudent investigation, *see Tatum II*, 761 F.3d at 358 (citing cases), and the district court's prior recognition that "the positive reports could have lent support for a decision to keep the funds in the Plan," *Tatum I,* 926 F. Supp. 2d at 688, on remand the district court concluded that a prudent fiduciary would have completely *ignored* these overwhelmingly favorable analyst recommendations. Op. 48-52.

The court reached this conclusion based, in part, on its observation that the "the number of buy recommendations was not

statistically different than the proportion of buy recommendations for the typical stock." Op. 50. Logically, however, this fact should have inclined the district court toward the opposite conclusion. In the context of an existing investment option that had recently experienced a significant decline and was trading at all-time lows, a hypothetical prudent fiduciary logically would find comfort in analyst ratings that were "not statistically different" than those of a "typical stock." Indeed, during the six-month period preceding the forced divestment of the Nabisco Funds, "the sell recommendations disappeared, hold recommendations fell, and buy recommendations increased." *Id.*

The district court also based its disregard of analyst ratings on a 2003 study indicating that "following analysts' ratings … would not have led to greater returns than following the S&P Index" between 1996 and the fourth quarter of 1999. Op. 52. However, it failed to explain how a study published in 2003 could have influenced the behavior of a hypothetical prudent fiduciary in January of 2000. *See generally United States v. Wooden*, 693 F.3d 440, 456 (4th Cir. 2012) (finding clear error because "the district court's account of the evidence in this regard simply is not plausible.").

Nonetheless, even if that evidence could be taken into account in some case, the district court's use of it conflates investment and divestment decisions. Even if investors cannot *beat the market* by *selecting* stocks according to analyst ratings, it simply does follow that a prudent fiduciary would have disregarded those ratings in evaluating whether to force Plan participants to *divest* their existing holdings of Nabisco stock. As Professor Lys explained, "[t]he odds are against you" if you *defy* analyst recommendations—by, for example, selling in the face of overwhelming buy recommendations. Vol. VIII 74:12-75:1. Defendants' expert Professor McEnally essentially agreed: whether "extraordinary" returns were predictable based on favorable analyst reports (by analogy, whether a basketball player is more likely than average to make her next free-throw) is a different question from whether the Plan should have forced the sale of the Nabisco Funds when the analyst reports were consistently favorable (by analogy, whether an average free-throw shooting basketball player should have been kicked off the team). *See* Vol. XII 152:2-14; Vol. XIII 29:23-31:15.

Because "the odds are against you" if you defy analyst recommendations, Professor Lys explained "you better have some

-45-

really good evidence why in fact that's a reasonable course of action."
Vol. VIII 74:12-75:1. *See also* Vol. VIII 159:23-24 ("What regression
tells you is, it is not a smart thing to leave the market" in the face of
positive analyst ratings.). Here the district court utterly failed to
identify any factors that warranted *selling* the stock in defiance of the
overwhelming consensus among analysts.

### 3.    There Was No Compelling Reason to Divest.

Valid reasons for divesting from an existing investment are
circumstances on par with "massive fraud in the company" or "reason to
think that the company was likely to go bankrupt." Vol. V 57:10-16
(Biller). Here, there was no evidence "whatsoever" that such conditions
existed. *Id.* at 57:8-16. There was no evidence that Nabisco stocks were
volatile. RJR Senior VP for Human Resources and Administration,
Gerald Angowitz—who was a member of the Pension Investment
Committee—testified that neither RJRN nor Nabisco stocks were
volatile. Vol. II 173:22-174:11; Vol. IX, 24:11-24. Company executives
testified that in 1999 they were not concerned about Nabisco's stock
prospects, the viability of the company, or bankruptcy. *See, e.g.*, Vol. II

166:14-172:10 (Angowitz); *id.* at 191:11-25 (Nabisco Treasurer Francis Suozzi).

Consistent with these facts, the evidence was unanimous that *all* contemporaneous fiduciaries and investors faced with the same decision—whether to divest Nabisco stock—*held* their Nabisco stocks. *See supra* at 13. The district court ignored this evidence.

Ultimately, as Dr. Biller and Professor Lys testified, there was *no* compelling reason to eliminate the Nabisco Funds as Plan investment options. *See, e.g.*, Vol. V (Biller) 57:23-58:10; Vol. VIII (Lys) 39:20-25, 46:14-47:1; 87:6-21; 169:15-23 (reading from PDX 299 at ¶ 72). A hypothetical prudent fiduciary deciding whether to *divest existing holdings* of the Nabisco Funds would not have relied on pending tobacco litigation, the risk of a non-employer, single-stock fund, or the decline in Nabisco share prices.

### a.    Tobacco Litigation Was Not a Compelling Reason to Divest.

The stability and strength of Nabisco's food business, coupled with the spin-off of Nabisco from RJR, would have led a reasonable fiduciary to conclude that the *Nabisco Funds* remained sound investment options

even in the face of pending tobacco litigation *against RJR*.[17]  *See* Vol. V at 162:6-163:12 (Biller) (explaining that pending tobacco litigation would not be "relevant" to "a plan which included NGH as one of its options as a long term investment option.").

"The purpose of the spin-off was to 'enhance shareholder value,' which included increasing the value of Nabisco by minimizing its exposure to and association with tobacco litigation." Op. 13-14. "[E]mployees from RJR and Nabisco testified at trial that it was widely believed the shareholder value of Nabisco would be enhanced after the split because the value of Nabisco's stocks was being unnecessarily depressed by investors' fears regarding ongoing litigation against tobacco companies." Op. 6.  Investment analysts believed the spin-off would increase the value of the Nabisco stocks by dissipating the tobacco taint, and sophisticated investors, including Carl Icahn,

---

[17] Because Tatum does not bear the burden on causation, the Court need not conclude that these facts alone would have caused a hypothetical prudent fiduciary to *retain* the Nabisco Funds.  Rather, these facts, together with other facts discussed herein, at a minimum render erroneous the district court's conclusion that defendants met their burden of proving that a hypothetical prudent fiduciary, more likely than not, would have forced participants to *divest* from the Nabisco Funds.

specifically supported the spin-off as a way to maximize long-term shareholder value.  *See supra* at 8-9.[18]  Thus, as Professor Lys explained, the spin-off "decoupled the movement of the tobacco stocks from the food stocks" such that, "if you already owned tobacco stock … , the Nabisco Stocks [became] actually less risky from … the perspective of the investor."  Vol. VIII 47:13-21.

The district court ignored this evidence.  It noted that developments between June and the end of 1999 increased the size of *RJR's* potential tobacco-related liability, Op. 62-63, but critically failed to address whether any such increase was offset by the undisputed decrease in risk that *Nabisco* would be liable for judgment against the now-unrelated tobacco companies.

Additional aspects of the spin-off further diminished any risk to Nabisco. RJR agreed to indemnify NGH for any tobacco liability.  *See supra* at 8.  Because of the restructuring and the influx of $8 billion

---

[18] The district court concluded that Icahn's subsequent take-over bid was a surprise, despite his history, Op. 53, but failed to realize that his statements in 1999 nonetheless demonstrated that sophisticated investors favored holding Nabisco stock.

from the sale of its international tobacco holdings,[19] RJR was in a stronger financial position to pay any judgment. An independent, contemporaneous financial and legal analysis concluded that there was no basis to fear that RJR's potential tobacco liabilities would exceed its ability to pay. PX-279 at TAT003653. *See Tatum II*, 761 F.3d at 358 (explaining that consulting "outside legal and financial expertise" may be part of a prudent investigation). This report included a veil-piercing analysis that concluded that Nabisco's assets could not be reached to satisfy judgment in tobacco litigation. PX-279 at TAT003506, -3638-48.

In short, the prospect that Nabisco would be liable as a result of tobacco-related class actions was speculative and remote, and would have required (1) entry of a judgment exceeding RJR's cash reserves and other resources; (2) exhaustion of appeals; (3) refusal of a structured settlement; (4) RJR's declaration of bankruptcy; (5) entry of a judgment disregarding corporate separateness; *and* (6) exhaustion of appeals by NGH.[20] A hypothetical prudent fiduciary simply would not

---

[19] *See* PX-158/DX-13 at RJR001585 (describing May 12, 1999 sale of RJR's international tobacco business for $8 billion).

[20] *See also* PX-226 at TAT000177-78 ("[T]he assets of NGH may only be threatened following numerous legal procedures, all of which would have to be decided against RJR, and NGH.").

have relied on this exceedingly remote risk to justify forcing the divestment of an existing investment option in light of all of the factors supporting holding the stock.[21]  Accordingly, as Professor Lys testified, there was no reason, from a risk analysis perspective, "to conclude that the stocks that were held prior to the spin-off should have been sold after the spin-off."  Vol. VIII 48:6-9.

A hypothetical prudent fiduciary also would have recognized that the favorable analyst reports and ratings already accounted for the risk related to tobacco litigation.  *See, e.g.*, Vol. VIII 38:16-23, 50:7-12 (Lys); PX-226 at TAT000176-77; PX-229 at TAT 200.  Indeed, reports issued in the fall of 1999, *after* analysts knew about the July *Engle* liability verdict, were *more favorable* than they were in spring of 1999.  *See*, *e.g.*, Vol. VIII 49:18-56:13, 57:17-68:9 (Lys).

In concluding that a hypothetical fiduciary would have relied on the risk of tobacco litigation, *see e.g.*, Op. 31-34, 62-63, the district court failed to consider any of the above-noted factors.  Although it briefly

---

[21] Additionally, given the long length of time before any potential judgment might be assessed against *Nabisco*, any events adverse to RJR that occurred in the *Engle* case during 1999 could not possibly satisfy defendants' burden of proof regarding the timing of the divestment.

recognized portions of Dr. Biller's testimony regarding the spinoff and tobacco litigation, the court apparently disregarded it because Dr. Biller had not reviewed Nabisco's SEC disclosures or news stories regarding the pending lawsuits. Op. 37. This contention is specious, as Dr. Biller based his testimony on a review of analyst reports, Vol. V at 186:8-9 which addressed the risk of tobacco litigation throughout 1999, *id.* at 47:24-48:12, *see also supra* at 51, and testified that he understood the concept of tobacco taint, *id.* at 48:4-12, and was aware that there had been a "very large judgment against RJR" in *Engle*. *Id.* at 185:15-19. At trial, Dr. Biller reviewed the post-*Engle* tobacco litigation disclosure in NGH's September 30, 1999 Form 10Q, and testified that it did not change his opinion. Vol. V 196:15-197:22, 199:22-25. Moreover, Dr. Biller testified that news articles regarding tobacco liability "would be irrelevant" to someone who already owned the stock "because the exposure that existed already existed for them." *Id.* at 159:1-2; [22] *see also id.* at 161:2-6 ("[T]he shareholder, at all knowledgeable, would have

---

[22] As explained *infra* at 62-67, the efficient market hypothesis—on which the district court heavily relies—compels the conclusion that this publicly available information was already reflected in Nabisco's share price and thus could not have provided any predictive value as to the future performance of the Nabisco Funds.

assumed that the risk existed already, prior to reading this statement.").

In any event, the district court's focus on perceived flaws in Dr. Biller's testimony does not justify its total disregard for the similar testimony of Professor Lys and for the abundant documentary evidence, detailed above, that would have led a prudent fiduciary to conclude that tobacco litigation did not compel the divestment of the Nabisco Funds while they were trading at all-time low prices. But for its legally erroneous focus on *investment* as opposed to *divestment* decisions, the district court would have been compelled to address this evidence.[23]

Ultimately, the district court's discussion of litigation risk betrays another legal error: its failure to consider whether a prudent fiduciary *more likely than not would have* relied on that risk. *See, e.g.*, Op. 32 ("[A] reasonable investor *could* infer that risk was increasing ….") (emphasis added); Op. 32-33 ("[T]he evidence of the tobacco taint suggests that it's *not unreasonable* to see that that risk of a single-stock fund indeed might be higher than the average single stock.") (emphasis

---

[23] This disregard for evidence also constitutes clear error. *See, e.g.*, *Jiminez*, 57 F.3d at 384.

-53-

added) (citation omitted).  While such conclusions might satisfy the district court's erroneous "could have" standard, they cannot demonstrate that a prudent fiduciary "would have" sold the Nabisco stocks, particularly in light the other factors this Court directed the district court to consider.

      **b.   The Decline in Nabisco Share Prices Was Not a Compelling Reason to Divest.**

Although a "fiduciary monitoring the Nabisco Funds would have seen that the Nabisco stock was losing value" during 1999, Op. 62, a prudent fiduciary would not have relied on that decline.  The Department of Labor has explained that "because stock prices fluctuate as a matter of course, even a steep drop in a stock's price would not, in and of itself, indicate that a named fiduciary's direction to purchase or hold such stock is imprudent."  Employee Benefits Security Administration, Dep't of Labor, Field Assistance Bulletin 2004-03, at 5 (Dec. 17, 2004).  Dr. Biller testified that the decline in Nabisco share prices was not a compelling reason to force the divestment of the Nabisco Funds.  Vol. V 63:16-23 (explaining that "[i]f price declines are sufficient reason to remove options, this past year, virtually every plan would have removed all options except for cash from their plans"); *id.* at

64:21-22 ("Stock price decline … isn't a reason to remove an option.").

Defendants' expert Crane agreed that a "short term decline" is not

sufficient reason to eliminate an option without further analysis.

Vol. XIII 177:19-23. The district court entirely ignored this testimony,

as well as the fact that no expert testified that a short-term decline in

share prices justified the forced divestment of an existing investment

option.

Relatedly, the district court's conclusion that the "appreciation of

the stock prices of NGH and NA after March 2000 was not foreseeable,"

Op. 53, misses the point. The district court cited testimony from

Defendants' expert Montgomery regarding the infrequency with which

stocks that had declined by 60% or 29 % (NGH's and NA's price

declines, respectively) recovered their value *in full* (requiring 150% and

41% increases, respectively) *within the subsequent year*. Op. 54. Based

on this analysis, the district court concluded that "'there is no reason'

based on the fact that a stock's price declines significantly 'to expect

that its return would be anything out of the ordinary in a subsequent

period.'" Op. 55 (citation omitted).

However, whether a prudent fiduciary would have expected NGH and NA stock to recover *completely* within *a single year*—a seemingly arbitrary period that ignores the long-term nature of Plan*, see supra* at 26-27—is a distinct question from whether a fiduciary would have expected the stocks to make a *partial* or complete recovery within a *reasonable period of time*.  The district court did not cite any analysis regarding the frequency with which stocks that suffered similar losses made recoveries within a reasonable timeframe.

More fundamentally, in focusing on "out of the ordinary" returns, the district court failed to consider whether a prudent fiduciary would have forced the divestment of an existing investment option expected to achieve *ordinary* returns.  The district court failed to consider whether a prudent fiduciary would have forced plan participants to sell at an all-time low if NGH and NA were reasonably expected to recover their losses at a rate of return at least as high as that of an alternative investment.  And as detailed above, the district court ignored ample evidence—regarding *inter alia* the strength of Nabisco's business, favorable analyst ratings, and the purpose of the spin-off—on which a

prudent fiduciary would have relied in determining whether an

ordinary, or better, return was likely.

### c. The Risk of Holding an Unrelated Single Stock Fund Was Not a Compelling Reason to Divest.

Because pending tobacco litigation and the decline in stock-prices

were not reasons to force the divestment of the Nabisco Funds, the only

remaining possible factor supporting the district court's conclusion that

"risk" was "[u]nmatched by [r]eturn," Op. 61, is the risk of a non-

employer, single-stock fund.  *See* Op. 31, 32, 36, 37-38, 61-62, 64.

However, this Court previously rejected the argument that "[n]on-

employer, single stock funds are imprudent *per se*" because it was

"directly at odds with our case law and federal regulations interpreting

ERISA's duty of prudence."  *Tatum II*, 761 F.3d at 360 (citing *DiFelice*,

497 F.3d at 420).  The district court essentially ignored this Court's

conclusion, as well as the case law and regulations supporting it.

In addition, a hypothetical prudent fiduciary would not have

viewed the risk of non-employer single-stock funds—particularly in the

context of a diversified portfolio, *see supra* at 22-26—as a reason to

divest an existing investment option.  *See, e.g.*, Vol. V 50:14-18 (Biller)

(fear of retaining "an unrelated single stock fund" was not a valid

reason for eliminating the Nabisco Funds).  Moreover, as Dr. Biller

explained, because the Nabisco Stock "was already in the Plan as an

undiversified option," keeping "[i]t wouldn't increase risk."

*Id.* at 56:1-3.

Tellingly, the district court disregarded this testimony based on

its insistence that the "*inclusion*" of "a non-employer single-stock

investment option *increased* the level of risk."  Op. 36 (emphases

added).  This again conflated the *elimination* of an existing investment

option with the *inclusion* of a new option.  The district court erroneously

reasoned that the Nabisco Funds were not existing funds because

"NGH only became a part of the Plan at the time of the spin-off."  *Id*.

This sophistic assertion ignores the district court's own findings that

(i) *NA* stock was a part of the plan prior to the spinoff, Op. 2; (ii) the

value of RJR Nabisco stock prior to the spin-off included the value of the

Nabisco food business, Op. 4-5; and (iii) NGH existed as an investment

option in the plan for six months between the date of the spinoff and the

forced divestment on January 31, 2000.  *Id*.  Thus, Dr. Biller correctly

stated that the Nabisco Funds already existed as undiversified funds in

the plan and thus could not have *added* any risk in January 2000.[24]
*See also Tatum II*, 761 F.3d at 351.

The district court also noted that Dr. Biller's clients did not invest in non-employer, single-stock funds and that Biller "never recommended" that his clients "should offer a non-employer single-stock fund."  Op. 38 (citing Vol. V 107:12-16).[25]  But this again ignores the distinction between advising that a plan *offer* a new investment option and advising a plan to force participants to *divest* from an existing stock fund.

Notably, the district court had previously found that when Winston-Salem Healthcare ("WSH"), a *former* subsidiary of RJR, was acquired by Novant Health, the 401(k) plan for WSH employees retained shares of RJR Nabisco stock (and later Nabisco stock) for years after WSH severed ties with RJR.  *Tatum I*, 926 F. Supp. 2d at 667 n.15 (citations omitted).  The district court's previous order attempted to

---

[24] The district court noted that Dr. Biller did not review certain plan documents, Op. 36, but Dr. Biller reviewed testimony quoting the Plan provision that required the retention of the Nabisco Funds.  Vol V. 201:20-203:3.

[25] Ironically, Defendants' expert Crane advised companies that held non-company stock in their plans.  Vol. XIII 117:5-14, 134:1-4, 145:13-146:24, 147:14-149:15.

distinguish the WSH plan on the grounds that a plan amendment required Nabisco stock remain as frozen funds, *id.* at 689 n.29, but that was *precisely* the case with respect to the Plan here. *See supra* at 28-30. A prudent fiduciary evaluating whether to disregard the Plan language and force the divestment of the Nabisco Funds would have considered how fiduciaries of other plans, including the WSH plan, acted under the same circumstances. Defendants presented no evidence that under these identical circumstances, the WSH plan fiduciaries forced the sale of Nabisco stock.[26]

Ultimately, the context of the spin-off highlights the absurdity of the district court's position. A participant who held shares in the combined RJR Nabisco company before the spin-off received shares of two companies through the spin-off—NGH and RJ Reynolds Tobacco Holdings. Op. 5. One of these companies was more closely tied to tobacco liability (RJR Tobacco) than the other (Nabisco). *Id.* It defies common sense to conclude—based strictly on a generic fear of holding

---

[26] The parties stipulated that—in addition to the fact that the WSH plan held Nabisco stock in a frozen fund—in five similar corporate situations, plans retained as frozen funds the stocks of former corporate affiliates. Vol II Pt. 2, at 24:11-25:5.

multiple single stocks or of holding "nonemployer" single stock, *see* Op. 62—that a prudent fiduciary would respond by forcing plan participants to sell *the Nabisco stock*, which unquestionably faced less risk from Tobacco liability than did the RJR Tobacco stock, which was not divested.

*    *    *

Because the district court's decision to weigh risk against the foreseeability of "extraordinary returns" was rooted in its failure to consider what a hypothetical fiduciary would have done in "the conduct of an enterprise of a like character and with like aims," 29 U.S.C. § 1104, the district court's holding should be reversed. *See Tatum II*, 761 F.3d at 351 ("[B]ecause the court … failed to apply the correct legal standard in assessing RJR's liability, we must reverse its judgment …").[27]

---

[27] Additionally, because it failed to "at least consider … and account for" abundant evidence indicating that a hypothetical prudent fiduciary would have retained the Nabisco Funds, the district court also committed clear error. *Wooden*, 693 F.3d at 454.

## III.   The District Court Misapplied the Efficient Market Hypothesis.

The district court's conclusion that "risk" was "[u]nmatched by [r]eturn," Op. 61-63, was based on a fundamental misunderstanding of the theory of efficient markets, as recognized by the Supreme Court. The "efficient market hypothesis" starts with the premise that "well developed markets are efficient processors of public information" and that "[i]n such markets, the 'market price of shares' will 'reflec[t] all publicly available information.'" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1192 (2013) (alteration in original) (citation omitted). *Accord* Op. 38-39.  The "weak" version of this hypothesis posits that "there is no reason to expect extraordinary returns based on the past performance of the stock," while the "semi-strong" form posits that "there is no reason to expect extraordinary returns based on any publicly available information."  Op. 38-39.

The district court found that the market for the Nabisco stocks was "generally efficient."  Op. 40-47.  It then concluded that the risk of holding the Nabisco Funds was not justified because there was no reason based on publicly available information to expect "extraordinary returns."  Op. 48-55, 63.  This was erroneous.

First, in concluding that publicly-disclosed risk warrants selling a stock absent an expectation of extraordinary returns, the district court flouted recent Supreme Court jurisprudence. In *Dudenhoeffer*, the Supreme Court made clear that because negative information regarding risk is already reflected in the market price, the duty of prudence does not require a fiduciary to remove an investment option based on publicly disclosed risk. *See* 134 S. Ct. at 2472 (a claim that defendants acted imprudently by failing to divest stock based on public information about risk demonstrated "an erroneous understanding of the prudence of relying on market prices"). The same logic applies here and compels the finding that a prudent fiduciary *would not* have divested Nabisco stocks based on the efficient market theory.

Second, not only is there no mention of "extraordinary returns" in *Dudenhoeffer*, but a rule requiring foreseeable "extraordinary returns" as a necessary criterion for buying or retaining an investment would lead to absurd results: Plan fiduciaries would be required to divest *all* investment options traded in an efficient market because extraordinary returns are *never* foreseeable in an efficient market. *See* Op. 38-39. Such a standard would effectively impose an improper *per se* ban on

investment in any asset traded on an efficient market. *But see supra* at 21, 57. Similarly, because three-quarters of the pension plan market "follow[] one active [investment] strategy or another," Vol. V at 69:22-70:11 (Biller), the district court's position necessarily would mean that at least three quarters of plan fiduciaries are acting imprudently by offering actively managed mutual funds that seek to outperform the market instead of offering less-expensive index funds that track the market. Paradoxically, it would also be imprudent to offer index funds, since they by definition could never attain extraordinary returns. Thus, by the district court's standard, it would be imprudent to buy or retain *any* investment option traded on an efficient market. This cannot possibly be the standard required by ERISA.

Third, even if a prudent fiduciary would have weighed risk against the foreseeability of "extraordinary returns," the district court's holding that "[r]isk [was] [u]nmatched by [r]eturn," Op. 61; *accord* Op. 38, was premised on an internally inconsistent application of the efficient market hypothesis. According to the district court, "a prudent fiduciary would have taken into account the litigation risk … and the consequent bankruptcy risk" and "would have seen that Nabisco stock

was losing value and that RJR was continuing to experience adverse rulings and verdicts related to tobacco litigation." Op. 62-63; *accord* Op. 56. In contrast, the court stated that "[b]ecause [Nabisco] traded on … a generally efficient market, research at the time would have revealed that there was no reason to expect extraordinary returns based upon analyst recommendations." Op. 63 (citation omitted).

As an initial matter, the court's emphasis on the fact that "Nabisco stock was losing value," Op. 62, is antithetical to the testimony of both sides' experts that "past performance of securities … has no predictive value." Vol. V 68:20-21 (Biller); Vol XII 169:8-10 (McEnally) ("The fact that a stock has gone down in value, or gone up in value, tells us absolutely nothing about where that stock is apt to go in the future."); *see also* Op. 39.

The court's more fundamental error lies in its contradictory conclusions that a prudent fiduciary would not have expected "extraordinary returns" based on *positive* public information but would have feared the risk of loss based on *negative* public information. Op. 62-63. In stretching to reinstate its prior judgment, the district court provided a lengthy discussion of future risk, Op. 31-35, 61-63, that

entirely ignored its own findings that these risks were publicly disclosed prior to the divestment of the Nabisco Funds. "[The r]isks associated with these [tobacco] lawsuits were disclosed" in May 19, 1999 SEC filings. Op. 14 (citing DX-13 at RJR001593). NGH's June 3, 1999 Form 8-K specifically reported the risk that Reynolds Tobacco and RJR may be "unable to satisfy their payment obligations for any adverse judgments" and that "plaintiffs in these cases would seek to recover … from the assets of NGH." Op. 15 (citing DX-88 at RJR018151-52). NGH disclosed the risks associated with the *Engle* case in its November 1999 Form 10-Q. Op. 15-16 (citing DX-33 at RJR018220-21).

Because all of this information was publicly disclosed *before* the forced divestment in January 2000, the efficient market hypothesis requires the conclusion that these publicly disclosed future risks were already factored into the price of the Nabisco Funds. *See, e.g.*, *Amgen*, 133 S. Ct. at 1192; *Dudenhoeffer*, 134 S. Ct. at 2471 (in efficient market, prudent fiduciary can assume that stock price reflects publicly disclosed risks); *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 66 (2d Cir. 2016) ("[R]isk is accounted for in the market price of a security.").

In fact, the district court expressly recognized that this information caused the drop in Nabisco share prices in 1999. Op. 16-17.

By concluding, as it did here, that *positive* public information did not justify expectations of future returns while *negative* public information justified concerns about future loss, the court committed clear error. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("[T]he court of appeals may well find clear error" if the district court relied on a story that is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.").

## IV.   The Court Should Direct the District Court to Enter Judgment for Tatum and the Class On Liability.

Because the district court disregarded the Mandate, failed to apply the appropriate legal standard, and clearly erred in its application of the efficient market hypothesis, its factual findings simply do not support a conclusion that it is more likely than not that a hypothetical prudent fiduciary would have forced plan participants to divest from the Nabisco Funds "at the time and in the manner in which RJR did." *Tatum II*, 761 F.3d at 364.  Indeed, the record permits only one possible conclusion: defendants did not and cannot meet their burden.

-67-

The evidence that the district court erroneously ignored—the "extraordinary circumstance" of the Plan's language, the Plan's long-term nature and diversified portfolio, the testimony of Professor Lys and other experts for both sides, the analyst recommendations, and information regarding the strength and stability of Nabisco's food business—strongly support the conclusion that a prudent fiduciary would have *retained* the Nabisco Funds. Meanwhile, as explained above, the district court's factual findings do not reflect *any* valid reason why a prudent fiduciary would have forced participants to divest, let alone a reason strong enough to overcome the contrary evidence.

The district court's failure to apply the appropriate legal standard and its misapplication of the efficient market hypothesis led it to improperly weigh risk against the foreseeability of "extraordinary returns," ignore analyst reports and positive information about Nabisco's strong fundamentals, and rely on past stock performance and risk regarding the tobacco taint. The only remaining basis for divestment identified by district court was a generic fear of holding a non-employer single-stock fund. However, this Court has already held that the fear of a non-employer single-stock fund cannot *ipso facto*

support a conclusion that a hypothetical prudent fiduciary would have divested from the Nabisco Funds. *Tatum II*, 761 F.3d at 367.

Because the record permits only one conclusion—that defendants cannot meet their burden of proving that a prudent fiduciary more likely than not would have forced Plan participants to divest from the Nabisco Funds on January 31, 2000—remand to the district court would be futile, and Tatum respectfully requests that the Court instead direct the district court to enter judgment on liability in favor of Tatum and the Class. *See, e.g.*, *Humphrey v. Humphrey*, 434 F.3d 243, 248 (4th Cir. 2006) ("A court need not remand a case if 'the record permits only one resolution of the factual issue.'") (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 291–92 (1982)); *Dea v. Wash. Suburban Sanitary Comm'n*, 11 F. App'x 352, 367 (4th Cir. 2001) (reversing and ordering that the district court enter judgment for plaintiff where "no evidence worthy of credit" supported defendant's case).

## V.   Tatum Respectfully Requests Reassignment on Remand.

Although reassignment is appropriate only in "unusual circumstances," it is appropriate where, as here, "both for the judge's sake and the appearance of justice an assignment to a different judge is

salutary and in the public interest, especially as it minimizes even a suspicion of partiality." *United States v. Guglielmi,* 929 F.2d 1001, 1007 (4th Cir. 1991) (citation omitted). This is the third time this case has reached this Court following an erroneous conclusion that Defendants should avoid all liability. Even after holding that Defendants breached their fiduciary duties, the district court twice concluded, erroneously, that defendants should avoid liability for their breaches. This Court previously determined that the district court misapplied the law and failed to consider relevant facts and circumstances. Yet on remand, the district court defied the Mandate, again misapplied the law, and committed clear error in its factual analysis.

In this context, "the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his … mind previously expressed view or findings determined to be erroneous." *Id.*; *cf. Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 537 (4th Cir. 1998) (reassigning to a new ALJ for a "fresh look at the evidence" where judge made "several errors of law including failing to consider all of the relevant evidence," despite instructions on remand). Remand to the

same judge for a third bite at the causation apple would unquestionably threaten "the appearance of justice." *Guglielmi,* 929 F.2d at 1007.

Additionally, at least seven years of this litigation have been spent waiting for the district court to issue decisions (including three years after trial and a year after completion of briefing on remand following *Tatum II*). Whether the adage that "justice delayed is justice denied" is true as a general principle, it is certainly true in a case involving retirement benefits, where many class members must have died during the fourteen years that this case has been litigated.

Even if this Court remands for further consideration of Defendants' case on causation, the factual record is well-developed, so remand to another judge would entail little additional "waste or duplication." *Id.* at 1008. Similarly, expert testimony on damages through a date before trial is already in the record, and no matter which judge presides over this case on remand, new evidence must be proffered regarding additional losses since then. Two other motions that were pending, but dismissed as moot, DE 486, also must be decided: defendants' fourth motion to decertify the class and their motion to exclude the losses of certain Class Members. However,

because these motions do not involve credibility issues, but rather legal

issues based on undisputed facts, they have no bearing reassignment.

## CONCLUSION AND RELIEF SOUGHT

The Court should reverse the district court's holding regarding

causation and direct entry of judgment on causation, and therefore on

liability, for Tatum and the Class. In the alternative it should remand

to a new district court judge for redetermination of whether a

hypothetical prudent fiduciary would have forced plan participants to

divest from the Nabisco Funds on January 31, 2000.

RESPECTFULLY SUBMITTED this 2nd day of June, 2016.

> *s/ Jeffrey Lewis*
> Jeffrey Lewis
> **KELLER ROHRBACK L.L.P.**
> 300 Lakeside Drive, Suite 1000
> Oakland, CA 94612
> Telephone: (510) 463-3900
> Facsimile: (510) 463-3901
>
> Matthew M. Gerend
> **KELLER ROHRBACK L.L.P.**
> 1201 Third Avenue, Suite 3200
> Seattle, WA 98101-3052
> Telephone: (206) 623-1900
> Facsimile: (206) 623-3384

Robert M. Elliot (7709)
Helen L. Parsonage (35492)
**ELLIOT MORGAN PARSONAGE, PLLC**
426 Old Salem Road
Winston-Salem, NC 27101
Telephone: (336) 724-2828
Facsimile: (336) 714-4498

Kelly M. Dermody
Daniel M. Hutchinson
**LIEFF CABRASER HEIMANN**
 **& BERNSTEIN, LLP**
Embarcadero Center West
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Attorneys for Plaintiff-Appellant and the Class*

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Federal Rule of Appellate Procedure 34(a) and Local Rule 34(a), Plaintiff-Appellant Richard Tatum requests oral argument on his appeal of *Tatum v. R.J. Reynolds Tobacco Company, et al.*, M.D.N.C. No. 1:02CV00373.

RESPECTFULLY SUBMITTED this 2nd day of June, 2016.

> *s/ Jeffrey Lewis*
> Jeffrey Lewis
> **KELLER ROHRBACK L.L.P.**
> 300 Lakeside Drive, Suite 1000
> Oakland, CA 94612
> Telephone: (510) 463-3900
> Facsimile: (510) 463-3901
>
> Matthew M. Gerend
> **KELLER ROHRBACK L.L.P.**
> 1201 Third Avenue, Suite 3200
> Seattle, WA 98101-3052
> Telephone: (206) 623-1900
> Facsimile: (206) 623-3384
>
> Robert M. Elliot (7709)
> Helen L. Parsonage (35492)
> **ELLIOT MORGAN PARSONAGE, PLLC**
> 426 Old Salem Road
> Winston-Salem, NC 27101
> Telephone: (336) 724-2828
> Facsimile: (336) 714-4498

Kelly M. Dermody
Daniel M. Hutchinson
**LIEFF CABRASER HEIMANN
 & BERNSTEIN, LLP**
Embarcadero Center West
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Attorneys for Plaintiff-Appellant and the
Class*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,978 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).  I relied on the word count of Microsoft Word 2013 in preparing this certificate.

2.    This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because the brief—in both its text and its footnotes—has been prepared in 14 point Century Schoolbook font.

I declare under penalty of perjury that the foregoing is true and correct.

*s/ Jeffrey Lewis*
Jeffrey Lewis

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on June 2, 2016, I caused this Page Proof

Brief of Appellant to be filed electronically with the Clerk of the Court

using the CM/ECF System, which will send notice of such filing to the

following registered CM/ECF users:

> Adam H. Charnes
> Chad D. Hansen
> Daniel R. Taylor, Jr.
> Thurston H. Webb
> Kilpatrick Townsend & Stockton, LLP
> 1001 West Fourth Street
> Winston-Salem, North Carolina 27101
> (336) 607-7382
> Counsel for Appellees

*s/ Jeffrey Lewis*
Jeffrey Lewis